# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ISAAC DONALD EVERLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-01440 |
| | ) | Judge Aleta A. Trauger |
| PATRICE Y. EVERLY, PHILLIP J. | ) | |
| EVERLY, CHRISTOPHER EVERLY, | ) | |
| THE PHILLIP EVERLY FAMILY | ) | |
| TRUST and EVERLY AND SONS | ) | |
| MUSIC (BMI), | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Isaac Donald Everly ("Don" or "Don Everly"), the plaintiff and counter-defendant in this action, and Phillip Everly ("Phil" or "Phil Everly"), who died in 2014, are brothers and comprised the music group, the Everly Brothers. Phil Everly is survived by his third wife, Patrice ("Patti") Everly, and two sons, Phillip J. Everly ("Jason Everly") and Christopher Isaac Everly ("Chris Everly"), by his first and second wives, respectively. Patti, Jason, and Chris Everly are the defendants and counter-plaintiffs in this action.[1]

One of the Everly Brothers' most famous hits is the song "Cathy's Clown," which was recorded and released in 1960. This case, reduced to its essence, is about who "authored" the song and, if both Don and Phil co-authored the song, whether Don Everly plainly and expressly repudiated Phil Everly's status as a co-author more than three years before the defendants filed their counterclaim. If so, those claims, all of which are premised upon Phil's status as a co-author

---

[1] Chris Everly, who is apparently disabled, has not been an active participant in this lawsuit.

of the song, are barred by the statute of limitations.

The parties had the opportunity to fully develop the record regarding these issues during a two-day bench trial conducted on April 27 and 28, 2021. After consideration of the testimony and exhibits presented at the trial, the court will enter judgment in favor of Don Everly.

## I.  PROCEDURAL HISTORY

Don Everly filed his Complaint for Declaratory Judgment (Doc. No. 1) on November 8, 2017, against Patti Everly, Jason Everly, and Chris Everly as the statutory successors to Phil Everly's termination rights under the United States Copyright Act ("Copyright Act"), specifically 17 U.S.C. §§ 304(c) and 203(a), and against the Phillip Everly Family Trust ("Trust") and Everly and Sons Music (BMI) (alleged to be an assumed name for the Trust (Doc. No. 1 ¶ 8)), as a legal owner or successor to Phil Everly's rights or as a legal owner of the statutory successors' rights (collectively "defendants"). The Complaint contains three "Counts," each seeking a declaratory judgment, only two of which remain relevant: Count 1 seeks a declaration that Phil Everly is not an author of "Cathy's Clown" (hereinafter also referred to as the "Composition") and, therefore, that the defendants are not the statutory successors of an author with respect to the Composition and are estopped from exercising any rights granted to authors of copyrighted works, including the ability to terminate the March 21, 1960 assignment (the "1960 Grant") of 100% of the worldwide copyright in the Composition to Acuff-Rose Publications ("Acuff-Rose"); Count 3 seeks a declaration that Don Everly owns 100% of the U.S. copyright in "Cathy's Clown" and 100% of the songwriter royalties derived from that work. (Doc. No. 1, at 12–13.) In addition, Count 2 sought a declaration that the "Release and Assignment" signed by Phil on June 10, 1980 pertaining to "Cathy's Clown" (the "1980 Release"), discussed in more detail below, is not a grant of a transfer or license of copyright or of any right under a copyright and, therefore, is not subject to termination under 17 U.S.C. § 203(a).

The defendants filed an Answer and Counterclaim (Doc. No. 5) on November 29, 2017. The Counterclaim seeks declarations that (1) Phil Everly is an author of "Cathy's Clown" "pursuant to 17 U.S.C. § 203"; (2) the defendants' Notice of Termination to Sony/ATV dated November 8, 2014 ("2014 Notice of Termination"), purporting to terminate the 1960 Grant, with an effective date of November 14, 2016, was valid under 17 U.S.C. § 304(c); and (3) the defendants are "entitled to one-half of the income earned from the exploitation of the Composition."[2] (Doc. No. 5, at 7.)

The court issued an order granting summary judgment to plaintiff Don Everly on November 6, 2018, finding that Don had expressly repudiated Phil's claim of authorship more than three years prior to the filing of the defendants' Counterclaim. (Doc. No. 27.) The Sixth Circuit reversed and remanded, finding that a material factual dispute existed as to whether Don had expressly repudiated Phil's authorship of "Cathy's Clown" at all. *Everly v. Everly* ("*Everly I*"), 958 F.3d 442 (6th Cir. 2020). This court subsequently construed the scope of the remand as general rather than limited, as a result of which "all claims at issue in the Complaint and Counterclaim remain[ed] pending [following remand], effectively without limitation." (Doc. No. 65, at 4.)[3]

Recognizing that the resolution of certain questions of law that had never been considered on the merits might narrow and simplify the trial of this matter, the court granted the parties'

---

[2] The Counterclaim does not specify a date on which the defendants claim to have become entitled to income from the exploitation of the Composition, but their Proposed Findings of Fact and Conclusions of Law filed in anticipation of the bench trial assert that the defendants are entitled to one-half the income derived from the exploitation of "Cathy's Clown" "in the United States from November 14, 2016 (the effective date of termination) through the present." (Doc. No. 88, at 19.) Neither party has requested that the court order any type of accounting.

[3] The exception to the general remand is that this court also awarded summary judgment to the plaintiff as to the authorship of two other compositions. Because the defendants did not appeal that portion of this court's judgment, the Sixth Circuit found that the defendants had "forfeited any argument" regarding those two compositions and affirmed summary judgment for the plaintiff on the claims related to them. *Everly I*, 958 F.3d at 448 n.6.

request that they be allowed to file a second round of dispositive motions. The plaintiff filed a Motion for Partial Summary Judgment, asking the court to rule on Count 2 of the Complaint and issue a judicial declaration that the 1980 Release is not subject to termination under 17 U.S.C. § 203(a), because it is not a "grant of a transfer or license of copyright or of any right under a copyright." (*See* Doc. No. 70.) The court granted that motion. *See Everly v. Everly* ("*Everly II*"), No. 3:17-cv-01440, 2020 WL 5642359, at *7 (M.D. Tenn. Sept. 22, 2020). Doing so did not actually resolve any dispositive issue in the case, but it did revolve Count 2.

The defendants filed a Motion for Judgment as a Matter of Law, asking the court to hold that (1) the statute of limitations cannot operate to bar the defendants' defenses to the plaintiff's affirmative claims, even if it might, arguably, bar the defendants' Counterclaim; and (2) the proper accrual date for their copyright termination claim is the effective date of the termination. (Doc. No. 69.) With regard to the latter claim, the defendants argued that, as "newfound claimants" to the copyright rights accruing after termination of the 1960 Grant, they should be permitted to "proceed without prejudice to what may have occurred during the original term." (Doc. No. 69, at 2.) The court understood the defendants' argument to be that their ability to terminate the 1960 Grant should not be time-barred, even if their claim that Phil is an author of the Composition is time-barred. The court denied the defendants' motion in its entirety, holding that: (1) if the defendants' authorship claim is time-barred, their defenses based on authorship, which mirror their affirmative claim, would also be time-barred; and (2) if the defendants' claim that Phil Everly is a co-author is time-barred, then the defendants cannot show that they are the successors of an "author" and do not have the ability to terminate the 1960 Grant. *See Everly II*, 2020 WL 5642359, at *14. However, because the court merely denied summary judgment to the defendants, all of their claims technically remained pending.

The parties filed a Joint Pretrial Order identifying two "Contested Issues of Law" to be resolved by a bench trial, but the issues they identify are actually the contested issues of fact to be resolved by the court as the trier of fact:

> A. Did Don Everly plainly and expressly repudiate Phil Everly's status as a co-author of *Cathy's Clown* more than three years before Defendants filed their counterclaim, or did Don simply demand that Phil relinquish public credit and songwriter royalties for *Cathy's Clown*?

> B. If Don Everly did not plainly and expressly repudiate Phil Everly's authorship claim more than three years before Defendants filed their counterclaim, is Phil a co-author of *Cathy's Clown*?

(Doc. No. 96, at 1–2.) Because the court answers the first question posed in A, above, in the affirmative, it need not reach the second question, and judgment in favor of the plaintiff on all claims will logically ensue, based on the legal conclusions the court has already reached in prior Memoranda entered in this case.

## II.     LEGAL FRAMEWORK

As the Sixth Circuit has explained, ownership in a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a); *Everly I*, 958 F.3d at 449. The owner of a copyright has the "exclusive right" to authorize the use and exploitation of a copyrighted work, including the rights to reproduce, perform, display, and distribute copies of the copyrighted work and to "prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106. These ownership rights "may be transferred in whole or in part." *Id.* § 201(d). Accordingly, in order to monetize a work, the author "commonly sells his rights to publishers who offer royalties in exchange for their services in producing and marketing the author's work." *Everly I*, 958 F.3d at 449 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985)).

Authorship of a work, however, imparts additional rights under copyright law "unaffected by the transfer of ownership." *Id.* Of particular relevance here is that authors possess a "termination

right," which allows them to terminate, after a statutorily defined period of time, "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright." 17 U.S.C. § 203(a) (providing the right to terminate post-1978 grants between thirty-five and forty years after the grant); *see id.* § 304(c)(3) (providing the right to terminate grants "executed before January 1, 1978" "at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later"). Importantly, unlike other copyright interests, "termination rights cannot be transferred." *Everly I*, 958 F.3d at 450 (citing 17 U.S.C. § 203(a)(5) (termination "may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or make any future grant"); *id.* § 304(c)(5) (same)).

Copyright claims are subject to a three-year statute of limitations. *See* 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). A copyright infringement claim accrues, and the limitations period begins to run, with each new "infringing act." *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007) (quoting *Ritchie v. Williams*, 395 F.3d 288 n.5 (6th Cir. 2005)). A copyright ownership claim, however, "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Id.* (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996)). An ownership claim accrues, and "[t]the statutory period for any action to establish ownership begins to run[,] whenever there is a 'plain and express repudiation' of ownership by one party as against the other." *Everly I*, 958 F.3d at 450 (quoting *Ritchie*, 395 F.3d at 288 n.5).

In *Everly I*, the Sixth Circuit acknowledged that ownership and authorship claims, while not identical, are similar, and it held that the "express repudiation" test also applies to a claim

related to authorship. *Id.* at 452. To be clear, "an authorship claim will not accrue until the putative author's status *as an author* is expressly repudiated; actions repudiating ownership are irrelevant to begin the statute of limitations for an authorship claim because repudiation of ownership is not adverse to the author's claim as such." *Id.* at 453.

> There are several means by which an "express repudiation" may occur:

> The party claiming sole authorship can repudiate the plaintiff's authorship (1) privately in direct communication with the plaintiff; (2) publicly by asserting sole authorship to the world and the plaintiff, including the listed credit on the published work; or (3) implicitly by receiving remuneration for the work to which the plaintiff is entitled. Of course, to repudiate the plaintiff's claims under the latter two theories, the receipt of money and credit must actually be adverse to the plaintiff's authorship status. . . .

*Id.* (internal citations omitted). "Regardless of whether repudiation of authorship is made privately, publicly or implicitly, it must come from someone asserting authorship of the work, not from a third party." *Id.* This requirement stems from the inalienable nature of authorship. *Id.* at 454. At the same time, the statements and conduct of third parties may "serve as circumstantial evidence that another putative author has expressly repudiated the plaintiff's rights." *Id.*

## III.  FINDINGS OF FACT

### A.  The Witnesses

By agreement, the parties took plaintiff Don Everly's deposition for proof in March 2018 and, in deference to his health and advanced age, rather than having him testify in person at the trial, played the entirety of his videotaped deposition, edited only to remove attorney colloquy and objections. In addition, the complete transcript of his deposition was entered into evidence as Plaintiff's Exhibit 70. Witness Joey Paige, a California resident, also testified by video deposition. Although defendants Jason Everly and Patti Everly were present at trial and testified live during the defense case, the plaintiff played portions of Jason Everly's videotaped deposition and read into evidence excerpts from Patti Everly's deposition, which was not videotaped, during his case

in chief. The plaintiff also entered all three of the transcripts for those depositions into evidence. (Pl.'s Exs. 71 (Paige Dep.), 72 (Jason Everly Dep.), 73 (Patti Everly Dep.).) The only witnesses called to testify in person by the plaintiff were Lewis Anderson, who owns and operates Legacyworks, LLC, and Francis J. Del Casino, a Nashville entertainment lawyer. In addition to the live testimony of Jason and Patti, the defendants called Teri Brown as a live witness and played into the record excerpts of the videotaped deposition of Jacqueline ("Jackie") Everly, Jason's mother and Phil's first wife.

No official transcript of the bench trial has been prepared, and the court has primarily relied on its own notes and memory in reaching the findings of fact herein. However, when appropriate, the court has provided citations to the deposition transcripts when quoting direct testimony for the witnesses for whom deposition transcripts have been entered into evidence.[4]

## B.     The Evidence

Many of the events giving rise to the claims in this case took place a long time ago—some of them more than sixty years ago—and the court's ability to develop a clear understanding of the facts has been significantly hampered by the passage of time, the erosion of memories, the disappearance of documents, and, most critically, the death of Phil Everly, the only person besides Don Everly who actually witnessed and participated in the disputed conversations and occurrences.

The basic background facts, however, are largely undisputed. The Everly Brothers were a highly successful musical group that performed together from the late 1950s until 1973. They reunited in 1983 and continued performing together off and on through 2005. Phil died in 2014 and is survived by his third wife, Patti Everly, and his sons, Jason and Chris.

---

[4] Even though the entire transcripts for the depositions of Don Everly, Jason Everly, Patti Everly, and Joey Page were entered into evidence, the court has relied upon only those portions that were actually read or played during the trial.

"Cathy's Clown" was recorded and released in 1960. Don and Phil are both listed as "authors" on the original copyright registration for the Composition. (Defs.' Ex. 2.) Pursuant to the 1960 Grant, referenced above, Don and Phil assigned 100% of the worldwide copyright in "Cathy's Clown" to Acuff-Rose, the assets of which were eventually acquired by Sony/ATV Music ("Sony"). Even after assigning the copyright in "Cathy's Clown" to Acuff-Rose, Don and Phil retained the contractual right to the so-called "songwriter's share" of royalties derived from the song.

Don Everly was born in 1937 and was 81 years old during his 2018 video deposition, which was taken for proof and played into the record at trial. In 1960, he was 23 years old, and Phil was 21. As Don explained, "We just kind of fell off the turnip truck. We were kids." (Pl.'s Ex. 70, D. Everly Dep. 64.) He also testified that he never read the contracts "they" (meaning primarily Wesley Rose of Acuff-Rose) put in front of him. "[T]hey put contracts in front of me and I signed them. That's it." (*Id.* at 67.)

There is no dispute that, from 1960 to June 1980, "Cathy's Clown" was publicly credited on all phonorecords and privately designated in business records as having been co-written by Don and Phil, and they shared the Composition's songwriter royalties. In a 1972 television interview on the David Frost Show, in response to questioning from Frost as to how many songs the brothers had written together and how many separately, Don responded that "Cathy's Clown" was one of the songs they had written together. Phil launched into a story about how they had written it together, explaining that Don had written most of the song before he called Phil over to his house. At the time, the brothers lived across the street from each other in Nashville. Phil came over and listened to the song, which already had a melody and the chorus. Phil claimed that he added some verses, and the song was finished. (Defs.' Ex. 5.) In 1961, BMI presented Don and Phil with an

award recognizing both of them as co-authors of "Cathy's Clown." (Defs.' Ex. 4.)

Don now claims that he wrote the song alone and that the only reason he credited Phil with co-authorship of "Cathy's Clown" and several other songs was because he was told by Wesley Rose that it would make the Everly Brothers more popular if the public believed that they wrote their songs together. Don testified emphatically that he wrote the entirety of "Cathy's Clown" himself, lyrics and music, and that he was also responsible for the musical arrangement and production. He stated unequivocally that Phil did not contribute words or music to the Composition. Indeed, the court finds very credible Don's detailed account about the origins of the song. He explained that it was inspired by the break-up "for no reason" from his high school girlfriend, Catherine Castle Craven Coe, and that the arrangement idea came from "sounds that [he] heard on the *Grand Canyon Suite*, a Disney film." (D. Everly Dep. 12, 55; *see also id.* ("[T]he sound of mules going down the path, down the canyon, that sort of gave me the inspiration for the arrangements in the music.").)[5]

Although the brothers' on-stage relationship appeared for the most part to be picture-perfect, the relationship soured substantially over time. It had deteriorated so much by 1973 that, according to Don, he sent Phil a letter giving him two weeks' notice that he was quitting the duo. At their last show, two weeks later, Don was drunk and "messing up" the lyrics, and the situation was so tense that Phil ended up smashing his guitar and walking off stage. (D. Everly Dep. 73–74.) Except for the 1980 telephone call, Phil and Don basically did not speak again for the next ten years.

---

[5] In the 1984 biography of the Everly Brothers, entitled *The Everly Brothers: Walk Right Back*, Don is also quoted as explaining that the Composition "had that walking thing with the drums which hadn't been used in pop music before. That came from the old Philip Morris commercial here in the States and I always liked it." (*See* Def.'s Ex. 7.)

But they did have at least two direct communications. First, in 1975, Linda Ronstadt recorded a song written by Phil Everly alone—"When Will I Be Loved"—that became a smash hit. Don knew that Phil was "making money from songwriting" as a result. (*Id.* at 19.) At some point after that release, but before June 1980, Don decided that it would be a good time to approach Phil about "set[ting] the record straight" about who actually wrote some of the songs they had recorded together. (*Id.* at 20.) Don testified that he sent a letter to Phil saying "you can give me my songs back." (*Id.*) By this, he meant to "correct the record legally that [he was] the sole writer" on "Cathy's Clown" and "some other songs." (*Id.* at 17, 20.)

As the defendants point out, there is no evidence in the record beyond Don's testimony that Don actually wrote Phil a letter. He did not retain a copy of it, and Phil is no longer around to verify whether he received such a letter. None of Phil's family or friends who testified at the trial recalls hearing him discuss receiving such a letter, and no such letter was located among Phil's possessions after his death. The court nonetheless finds Don's testimony regarding the letter to be credible, particularly in light of his testimony that he had also sent Phil a letter to terminate their singing partnership in 1973 and the fact that they were not on cordial terms and lived across the country from each other during this timeframe, with Don in Tennessee and Phil in California. The precise wording of the letter and the date on which it was sent, however, are not clear.

Regarding the second communication, the evidence establishes that Don followed up the letter with a telephone call to Phil sometime during the first half of 1980. Don, who conceded that he would "sometimes" during this period get "drunk and stoned" and "angry at Phil," does not recall this conversation. (*Id.* at 78.) In his deposition, Don testified that the letter was his only communication with Phil about getting Phil to "sign over" his share in certain songs to Don. (*Id.* at 41.) In a Declaration prepared on July 20, 2018 and admitted as an exhibit at the bench trial,

Don stated: "I've been told that a number of witnesses in this matter have testified that I called Phil to harass him to get my songs back. I don't have any recollection of a phone call like that, but if I did call him, it was likely a follow up to the letter I had sent." (D. Everly Decl. ¶ 13, Pl.'s Ex. 1.)

Several witnesses testified that this telephone call occurred and that it had a significant effect on Phil, including Joey Paige, Jason Everly, Teri Brown, and Jackie Everly. Joey Paige was formerly a bass player for the Everly Brothers and remained close friends with Phil even after the duo broke up, and he and Phil lived in California and Don lived in Tennessee. Asked about the relationship between the brothers that he observed while traveling with the band and spending a lot of time with both Don and Phil, Paige described it as "strange. Sometimes it was good, sometimes it was bad. Other times it was intolerable." (J. Paige Dep. 10.) Paige frequently found himself in the middle, mediating between the brothers, going so far as to select which outfits they would wear on stage and which songs they would perform, to try to minimize conflict. (*Id.*) There was both a "lot of conflict" and a "lot of love." (*Id.* at 11.) According to Paige, Don was the "dominant" party in the relationship, while Phil was always in the role of "little brother." (*Id.*)

Paige testified that he was hanging out at Phil's house one day in 1980 when Phil received a telephone call from Don. He saw Phil pick up the phone and say "Hi Don," and from there the call became "violent verbally." (*Id.* at 12.) Paige heard Phil say something like, "how can you do this to me, you know I wrote half that song." (*Id.* at 13.) This was at the beginning of the conversation. The call lasted about ten minutes, with Phil becoming increasingly agitated and angry. After the call ended, Phil was "pissed," "pacing back and forth in the living room," and saying, "I can't believe this is going on." (*Id.*) Phil told Paige, "I just told him I'm going to give it back to him," referring to "Cathy's Clown." (*Id.* at 13–14.) According to Paige, Phil said "he wrote

half of it and Don wanted it back." (*Id.* at 14.) Paige told Phil, "don't do this in haste . . . . If you believe you wrote half that song, then you have the rights to half that song." (*Id.*)

No other person witnessed that telephone conversation directly, but Phil's son, Jason Everly, who was 14 years old at the time, came home from school one day to find Joey Paige and his father at the house and his father very upset and angry. Jason understood only that his father and uncle had talked on the phone, which was unusual at that point, since they were not on speaking terms and really had not been on good terms since the break-up of the duo in 1973. Jason also was aware that, after the telephone call, his father had "signed paperwork saying, 'I absolve myself of the writership.'" (Pl.'s Ex. 72, Jason Everly Dep. 28.)

Similarly, Teri Brown, a witness with long ties to the entertainment business and the Everly Brothers and who was a close friend of Phil's in 1980, testified that she arrived at Phil's house later that same day in 1980, as Paige was leaving. Upon her arrival, she found Phil visibly shaken and angry; she had never seen him that upset before. He told her that he had spoken with Don on the phone and that "he had given up his share of writing in the copyright of 'Cathy's Clown.'" Brown claimed that Phil did not want to discuss the matter further at that time but later explained to her that he just "had to keep the peace." Jackie Everly, who was not there, also testified that Phil told her about a telephone call with Don, which was unusual in itself, and that "his brother had asked him for the rights to 'Cathy's Clown' and that he had agreed."

The court acknowledges that some of the testimony about what Phil told witnesses or what they overheard him say may constitute hearsay, but neither party objected to its introduction.[6] Regardless, the court finds the testimony relevant primarily to establish that a telephone call

---

[6] Because no party objected, the court had no reason to determine whether the statements fell within one of the exceptions identified in Rules 803, 804, or 807.

between Don and Phil actually took place and as circumstantial evidence regarding what Don said to Phil to provoke such a reaction. Based on Don's testimony about the letter and his intentions, it is clear to the court that, during this telephone conversation, Don relayed to Phil his belief that Phil was not a co-author of "Cathy's Clown" and several other songs and should not continue to take credit for being a co-author, and Don demanded that Phil "take his name off" the songs—that is, legally acknowledge that he did not co-write "Cathy's Clown" and the other contested songs. Don's testimony establishes that this was the gist of his communication with Phil: "My songs were mine again. I had written them and that was it." (D. Everly Dep. 20.) Phil objected and, as his family members testified, continued to grumble about it for the next twenty or thirty years, but he ultimately acquiesced.

This conclusion—regarding both what Don said to Phil and Phil's acquiescence, is further supported by the undisputed fact that, on June 10 and 11, 1980, Phil signed five documents, each titled "Release and Assignment," pertaining to "Cathy's Clown" and sixteen other musical compositions (the "Released Songs") whose original copyright registrations indicated that they had been written by both Don and Phil. (Pl.'s Ex. 2; Defs.' Ex. 6.)[7] Phil's signature on each document was notarized by a notary based in Los Angeles County, California.[8]

The 1980 Release pertaining to "Cathy's Clown" acknowledges that Don and Phil had entered into an agreement with Acuff-Rose, as publisher, transferring certain rights relating to the

---

[7] To be clear, this lawsuit now concerns only "Cathy's Clown." The plaintiff's Exhibit 2 includes all five of the 1980 Releases. Defendants' Exhibit 6 consists of just the 1980 Release relating to "Cathy's Clown."

[8] Don had no recollection regarding the preparation of the 1980 Releases, though he thought that Acuff-Rose had probably prepared them and sent them to Phil. (D. Everly Dep. 20.) Jason Everly testified to his belief that "Donald's person" prepared the documents and that Phil himself would never have done so. (Jason Everly Dep. 29.) He also claimed that his father told him many times over the years that he had told Don, "Screw you. Send me the goddamn paperwork and I'll sign it." (*Id.* at 30.)

Composition to Acuff-Rose and that said agreement "listed both Phil Everly and Don Everly as composers of said compositions." (Defs.' Ex. 6.) Notwithstanding that prior representation, according to the 1980 Release, "Phil Everly desires to release, and transfer, to the said Don Everly all of his rights, interests and claim in and to ['Cathy's Clown'], including rights to royalties *and his claim as co-composer*, effective June 1, 1980." (*Id.* (emphasis added).) Accordingly, pursuant to the Release, Phil did

> transfer, release, assign and set over unto Don Everly all of his rights, titles, interests and claim to the musical compositions "CATHY'S CLOWN" [and two other works], the copyrights of which were obtained in 1960 by Acuff-Rose Publications, and which are still owned by them. This transfer and release . . . includes not only the said Phil Everly's right to royalties and other income arising out of the said compositions from and after the effective date, but also *every claim of every nature by him as to the compositions [sic] of said songs*.

(*Id.* (emphasis added).) Finally, the Release authorized and directed BMI and Acuff-Rose to "correct their records accordingly and to make payments of amounts due and to become due to the said Don Everly solely on and after the effective date hereof." (*Id.*)

The court does not find credible the defendants' contention that the telephone call and Phil's subsequent signing of the 1980 Release signaled only that Phil was voluntarily relinquishing public credit and songwriter royalties for "Cathy's Clown," rather than his co-authorship status *per se*. There was no discussion of money during the telephone call. The communications were about Don's assertion that he alone wrote "Cathy's Clown." Indeed, the fact that, following Phil's signing of the 1980 Release, Don alone received the songwriter royalties and was credited on all publications of the work as being the sole author constitutes further circumstantial evidence of Don's repudiation of Phil's authorship. In 1988, Acuff-Rose renewed the copyright to "Cathy's Clown" in Don's name only. (Defs.' Ex. 9.) In 1990, when Reba McEntire recorded a cover of "Cathy's Clown," Don was listed as the sole author in the record sleeve, liner notes, press materials, and sheet music. In addition, Don subsequently received several awards as the sole

songwriter of "Cathy's Clown." (Defs.' Exs. 10, 11.) The court does not view these events—McEntire's recording of the song and the songwriter credit accruing to Don—as public repudiation of Phil's authorship, but they do constitute further evidence of the private repudiation that occurred in 1980 and by which the brothers abided for the remainder of Phil's life.

To that point, during Phil's lifetime, he never treated the 1980 Release as simply a statutorily terminable contractual assignment of his right to receive royalties. Instead, he treated it as a concession that he was no longer to be deemed an author of "Cathy's Clown." The fact that he took steps later in his life to terminate copyright grants related to many of the other still-lucrative songs that he had written alone or with Don further supports the conclusion that he knew how to terminate grants and, further, that he knew how to ask for help in doing it. In that regard, before he died, Phil began looking into recapturing copyrights granted in the 1950s and 1960s, pursuant to 17 U.S.C. § 304(c). Phil retained Lewis Anderson to help him with that endeavor beginning in November 2007. Anderson is the owner of a single-member limited liability company, Legacyworks, LLC, which engages in work for songwriter clients to recapture copyright ownership originally signed away—or, in legal terms, to terminate copyright grants for songwriters and their heirs.

As Anderson testified, his website explains (and the law substantiates) that, for songs copyrighted prior to 1978 and assigned by agreement prior to 1978, there is a five-year window of opportunity for terminating the grant, beginning on the fifty-sixth anniversary of the earlier of either the first registration of copyright or the first date the work was published with copyright notice. The five-year window closes on the last day of the 60th year following that date. The writer will choose a date within that five-year window for terminating the previous copyright assignment, or grant, and will typically choose the earliest day possible. Notification of termination of the grant

must be extended to the copyright holder no sooner than ten years prior to the termination date chosen by the writer and no later than two years prior to that date (and, therefore, no later than two years prior to the closing of the five-year window for termination).

Based on these parameters, the earliest date on which a termination notice for the copyright grant for "Cathy's Clown" could have been filed was April 14, 2006, and the earliest effective date of such termination would be April 14, 2016. Don Everly, in fact, retained Nashville attorney Francis Del Casino to file termination notices for him beginning in 2010. Del Casino filed and served a notice of termination for "Cathy's Clown" on behalf of Don Everly on March 11, 2011, with an effective date of April 14, 2016. (*See* Pl.'s Ex. 64.) Anderson, on behalf of Phil, filed notices of termination for three other songs in 2008, but not for "Cathy's Clown" or any of the other sixteen Released Songs.

Although Anderson did not recall having a specific conversation with Phil about "Cathy's Clown," his recollection in that regard was impeached by an email to Patti Everly dated September 25, 2014, responding to a question from Patti about whether Phil could recapture the copyright for "Cathy's Clown." In the email, Anderson stated, "Phil had told me that he made an agreement with Don to remove himself as writer of 'Cathy's Clown.'" (Pl.'s Ex. 21.) After Phil's death, however, Anderson was retained by Patti Everly and Jason Everly, on behalf of Phil's estate, to proceed with filing notices of termination for Phil's entire catalogue of songs, including "Cathy's Clown."

Patti was married to Phil from 1999 until his death on January 3, 2014. She testified that, over the course of their twenty years together, Phil made reference to Don's having "fussed at him" to "give up" "Cathy's Clown," but she also conceded that he never did anything about it— never went to Sony or to BMI to say that he wanted his "name back on the song" and never hired a lawyer help him reclaim his authorship status. However, she also claimed that, before Phil died,

she had gone with him to meet with Brent McBride of Copyright Recapture to discuss recapturing the copyrights on additional songs, besides those recaptured by Lewis Anderson years before. Patti claimed that Phil and McBride discussed termination of the copyright grant for "Cathy's Clown." Jason Everly also testified that his father told him that he had hired someone to prepare a notice of termination of the grant of copyright for "Cathy's Clown" and that a notice of termination was actually filed for "Cathy's Clown," but Jason never saw it. He claimed that Patti saw it, but Patti did not testify that she saw a notice of termination for "Cathy's Clown."

Patti went to Lewis Anderson after Phil's death, because she believed that the notices of termination that Brent McBride was supposed to have filed were not done correctly. She implied that "Cathy's Clown" was among those songs for which McBride was supposed to have filed termination notices, in accordance with Phil's wishes, but had failed to do so. According to the documentary evidence introduced at trial, however, McBride filed termination notices for nineteen songs written by Phil alone or by Phil and Don together. The list of songs on the notice of termination prepared by McBride on behalf of Phil, a copy of which was provided to Phil, did not include "Cathy's Clown" or any of the Released Songs. (*See* Pl.'s Ex. 73 (Late-filed Ex. 1 to Patti Everly Dep.);[9] *see also* Pl.'s Ex. 22 (email from Anderson to Sony verifying its receipt of notices of termination prepared by McBride for the same nineteen songs).) Lewis Anderson did not find any evidence that McBride prepared a notice of termination for "Cathy's Clown," but he, upon Jason and Patti's request, prepared and filed a notice of termination for the grant of "Cathy's

---

[9] The exhibit to which the court refers is the February 1, 2012 email from Brent McBride to Phil Everly, to which were attached copies of the Notices of Termination prepared at Phil's behest and explaining that some of the delay in filing was because the "window" for filing termination notices for some of the songs had not opened until the end of 2011, and it made more sense financially to file a single notice for all of the songs for which Phil had requested that McBride seek terminations.

Clown" on October 24, 2014, with a purported effective date of November 14, 2016. (Pl.'s Ex. 24.)

Besides the fact that it was based entirely on hearsay (to which no objection was raised), the court does not find credible Jason Everly's testimony and Patti Everly's insinuation that Phil ever sought to terminate the copyright grant for "Cathy's Clown" during his lifetime. That belief is contradicted by the available documentary evidence, which shows that Phil sought to terminate the grants for twenty-two specific songs during his lifetime, but not "Cathy's Clown." In addition, the testimony is contrary to Phil's course of conduct up until that time and with Phil's statement (also hearsay to which no one objected) to Lewis Anderson that he had "agreed with Don to remove himself" as an author of "Cathy's Clown."[10] The clear result of that agreement, in Phil's mind, was that Don had repudiated his authorship and, in response to Don's repudiation, Phil had abandoned any claim to authorship, meaning that he no longer had an author's right to terminate the copyright grant with respect to "Cathy's Clown."

To be sure, the defendants point to statements by Phil and Don regarding the authorship of "Cathy's Clown" after 1980 as evidence that Don had not clearly and expressly repudiated Phil's authorship and, instead, had somehow only persuaded Phil to give up his right to royalties and official credit as a co-author. These include statements in a 1984 television interview as well as in *Walk Right Back*, the 1984 biography of the Everly Brothers. The 1984 television interview is the only post-1984 media statement by Don concerning the authorship of "Cathy's Clown." There, Don, stated, regarding the creation of "Cathy's Clown": "They were pressing us really desperately for a record and it was our first record on Warner. . . . Finally, I started a song, called Phil over, he

---

[10] Anderson, unlike Patti and Jason, was a disinterested witness, and this court found him extremely credible.

came over and we worked—we hashed it out, and went into the studio . . . ." This version of the song's creation, which differs slightly from the 1972 version offered by Phil on the David Frost Show, does not necessarily credit Phil with co-writing the song. The phrase "we hashed it out" could just as easily mean that they worked on the harmonies and instrumentation, and not necessarily that Phil contributed any lyrics or music to the Composition. In addition, by 1984, Don and Phil had reunited and were touring together as a duo again. Don, when asked why he would have said on national television after 1980 that Phil cowrote the song, testified first that he did not remember doing that, though he "might have." But he did claim that he "wanted to keep [Phil] happy. And that's the story he had been telling, so I just left it that way." (D. Everly Dep. 59.)

In the section of *Walk Right Back* that addresses the provenance of "Cathy's Clown," Phil is quoted as stating, exactly as he had in the David Frost interview, that Don had called him to come over after the melody and the chorus were already formulated and that Phil "put together the verses and it was finished." (Defs.' Ex. 7 (*Walk Right Back* 63–64).) Notably, there is no evidence in the record as to whether or when Don or Phil was interviewed for the book regarding the creation of "Cathy's Clown." Consequently, it is just as likely that Phil's story of the creation of "Cathy's Clown" was drawn directly from the 1972 David Frost interview. The book further states that "Cathy's Clown" "was primarily Don's as had been most of the songs put out under their joint names. The copyright situation was resolved in 1980 when Phil signed away his rights to the songs." (*Id.* (*Walk Right Back* 64).) The book quotes Phil as stating: "Some of the things were inaccurate. I worked on *Cathy's Clown* but not on those other early ones. At the time I did the work on it I said to Wesley, 'Give the song to Donald to make up for the others,' knowing that it was going to be a big hit." (*Id.*) This statement provides some indication as to Phil's motivation

for legally abandoning any claim of having co-authored "Cathy's Clown." [11] Moreover, the book does not quote *Don* as crediting Phil with writing the song. Instead, Don is quoted as explaining in some detail his various inspirations for the song, including that it was about his high school girlfriend and that the melody had been inspired by the *Grand Canyon Suite*.

The defendants portray Don as a bully who repeatedly badgered Phil to give up his rights to "Cathy's Clown." That portrait, however, is inconsistent with the apparently undisputed fact that Phil and Don had essentially no direct contact from the time the duo broke up in 1973 until the telephone call that resulted in Phil's signing the 1980 Release. A single telephone call does not qualify as pestering. The court accepts that Don was imperious and difficult to work with, and Don's being a bully would explain in part why he would repudiate Phil's contribution to writing "Cathy's Clown," if indeed he made any such contribution. But the story about Don's bullying does not explain why Phil would sign the 1980 Release unless Phil understood that Don was claiming sole authorship of "Cathy's Clown" and that Phil would no longer be credited as a co-author of the work.

In sum, the court finds, by a preponderance of the evidence, that Don plainly and expressly repudiated Phil's authorship of "Cathy's Clown" by letter and then by telephone call in 1980 and that the 1980 Release was intended to be a memorialization of that repudiation. Further, it is undisputed that Phil did not make any attempt within the three-year limitations period, or, indeed, within the remaining thirty-four years of his lifetime, to reclaim co-authorship status. As a result, the plain and express repudiation is dispositive of all legal issues in the case, as discussed below.

---

[11] The court notes that Phil's statements in this book are, once again, hearsay to which neither party objected. In fact, both parties included this excerpt among their exhibits.

## IV.  CONCLUSIONS OF LAW

### A.  The Effect of Repudiation on the Defendants' Counterclaims

This lawsuit came about because the defendants filed and served notices purporting to terminate both the 1960 Grant and the 1980 Release. Because the defendants, as Phil's successors in interest, were affirmatively claiming a right to a 50% share of the copyright and songwriter royalties in "Cathy's Clown," Don filed this declaratory judgment action seeking declarations that Phil is not an author and that Don owns 100% of the U.S. copyright in "Cathy's Clown" and 100% of the songwriter royalties derived from that work. (Doc. No. 1, at 12–13.) The defendants raised as a defense to Don's claims what amounts to an affirmative claim: that Phil is a co-author of the Composition. At the same time, they also filed a Counterclaim seeking affirmative declarations that Phil Everly is an author of "Cathy's Clown" and, therefore, that their notice of termination purporting to terminate the 1960 Grant was valid and that they are entitled to half of the income derived from the exploitation of the Composition. (Doc. No. 5, at 7.)

Don Everly raised the statute of limitations as an affirmative defense in his Answer to the Counterclaim. (Doc. No. 7, at 3–4.) As set forth above, Don directly and expressly repudiated Phil's status as a co-author of "Cathy's Clown" in the letter and telephone call that took place prior to June 10, 1980. The limitations period during which Phil, or his statutory heirs, could bring a claim of co-authorship expired no later than June 1983, thus also dooming any subsequent claim that depends on Phil's co-authorship as an essential element of the claim. All of the claims in the defendants' November 2017 Counterclaim hinge upon their ability to establish Phil's authorship—including their request for a declaration that Phil is an author of the Composition, their request for a declaration as to the validity of the Notice of Termination that purported to terminate the 1960 Grant, and a declaration that they are entitled to half the income earned from the exploitation of the Composition as of the effective date of the termination. Because the claim that Phil is a co-

author of the Composition is time-barred, and the other claims depend upon being able to establish Phil's co-authorship, all of the claims fail as a matter of law.

The defendants argued in their Motion for Judgment as a Matter of Law (Doc. No. 69) and again during their closing argument at trial that, *even if* there was a clear and express repudiation of authorship by Don Everly in 1980 and *even if* their claims based on Phil's authorship are time-barred, the three-year statute of limitations for their suit to declare the validity of their notice of termination as to the 1960 Grant did not begin to run until the November 2016 effective date of termination. The defendants' theory, purportedly premised on *Wilson v. Dynatone Publishing Co.*, 892 F.3d 112 (2d Cir.), *rehearing denied*, 908 F.3d 843 (2d Cir. 2018), is that Patty and Jason's termination rights are distinct from those of Phil, such that their termination rights claim could only accrue as of the effective date of their 2014 Notice of Termination of the 1960 Grant, or November 14, 2016. Under this theory, because their Counterclaim was filed within three years of that date, their notice of termination was timely and valid, irrespective of what happened between Phil and Don before that date.

The court has already rejected this argument in the context of denying the plaintiff's Motion for Judgment as a Matter of Law, where the defendants explained their theory with more precision. *See Everly II*, 2020 WL 5642359, at *13. The court found that the defendants' reliance on *Wilson* and S*iegel v. Warner Brothers Entertainment, Inc.*, 542 F. Supp. 2d 1098, *reversed in part sub nom. Larson v. Warner Bros. Entertainment*, 504 F. App'x 586 (9th Cir. 2013), was misplaced and held as follows:

> [T]he defendants' termination claim in this case is entirely derivative of their authorship claim. Because termination rights can be exercised only by authors or their successors, 17 U.S.C. § 304(c), (a)(1)(C), the defendants' ability as Phil's successors to exercise termination rights depends on their being able to establish that Phil is a co-author of the work in question. In other words, authorship (or being the successor of an author) is a necessary element of a termination claim. If the

defendants' ability to claim Phil's status as co-author is found to be time-barred, then their termination claim will necessarily fail, not due to the statute of limitations *per se*, but because they will be unable to establish an essential element of the termination claim.

*Everly II*, 2020 WL 5642359, at *13 (citing *Everly I*, 958 F.3d at 450 ("But, for Phil to have any right to termination, he must be an 'author' of Cathy's Clown.")). The court reincorporates that holding in its entirety here.

The court has found that the defendants' ability to claim Phil's status as co-author of "Cathy's Clown" is time-barred. As a result, because they cannot establish that they are the statutory successors of an "author," all of the claims in their Counterclaim, including their termination claim, necessarily fail, because they cannot establish an essential element of their claims.

### B. The Effect of Repudiation on Don Everly's Claims and the Defendants' Affirmative Defense

The defendants argued in their Motion for Judgment as a Matter of Law and apparently continue to argue now that, even if the statute of limitations bars their Counterclaim, it does not operate to bar their affirmative defense of co-authorship to the plaintiff's Complaint. The court rejected that contention in the September 2020 ruling, *Everly II*, 2020 WL 5642359, at *8–11, and reaffirms that conclusion now.[12]

Certainly, as a general rule, a statute of limitations does not bar affirmative defenses. *See, e.g.*, *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 72 (1956) ("To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); *Luckenbach Steamship Co. v. United States*,

---

[12] In light of its importance to the ultimate ruling in this case, the court sets forth below basically verbatim the analysis of this issue contained in *Everly II*, with only slight modifications. For ease of reading, the court has not set the "borrowing" from *Everly II* in block quotation format.

312 F.2d 545, 548–51, 552 n.3 (2d Cir. 1963) ("The law is well settled that limitations do not normally run against a defense.").

This principle has been applied in the copyright context as well. *See, e.g.*, *TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019) (rejecting the plaintiff's contention that the Copyright Act's statute of limitations barred the defendant's co-ownership defense to the plaintiff's copyright infringement claims and noting that the rule "holds true even if the defendant also brings an untimely ownership counterclaim"); *Est. of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 163 (2d Cir. 2003) (holding that the defendant's factual "work for hire" defense to the plaintiff's renewal rights claim based on authorship was not time-barred and noting that the defendant had not "made a claim" or asserted a counterclaim).

However, most rules, including the rule that a statute of limitations will not bar defenses, are subject to exceptions. Although the Sixth Circuit has not yet addressed the question, several courts have held that an exception to the rule prohibits parties from "skirting" statutes of limitation by "bringing time-barred claims as affirmative defenses." *Heartland Materials, Inc. v. Warren Paving, Inc.*, No. 5:16-CV-00146-TBR, 2018 WL 2324075, at *5 (W.D. Ky. May 22, 2018) (citing *City of Saint Paul v. Evans*, 344 F.3d 1029, 1031 (9th Cir. 2003)), *aff'd*, 819 F. App'x 323 (6th Cir. 2020).

In *Evans*, the plaintiff City brought suit challenging the validity of a settlement agreement, and the defendant filed counterclaims to reaffirm the agreement. The district court found that the City's claims were barred by the six-year statute of limitations, but it "permitted the City to raise the identical allegations as defenses to [the defendants'] counterclaims. *Evans*, 344 F.3d at 1031. The district court then ruled on the merits of the defenses and entered judgment in favor of the defendants. On appeal, the Ninth Circuit affirmed on the basis that "the City's affirmative defenses

are likewise barred by the statute of limitations," without reaching the merits of the defenses. It concluded that "[t]o hold otherwise would permit plaintiffs, through a sort of jurisdictional jujitsu, to evade the limitations statutes by bringing a time-barred declaratory judgment action, waiting for the defendant to assert its interests in the form of a counterclaim, and then raising the identical time-barred claims as defenses." *Id.* In reaching that conclusion, the Ninth Circuit acknowledged the rule that parties are generally permitted to raise defenses that would be time-barred if they were raised instead as affirmative claims for relief. *Id.* at 1033–34 (citing *W. Pac. R.R.*, 352 U.S. at 72; *Luckenbach S.S. Co.*, 312 F.2d at 548–49). The court noted, however, that "[a] common thread running through these cases [in which time-barred claims have been permitted to be raised as defenses] is the emphasis on the respective roles of the parties in the litigation as a whole." *Id.* at 1035. Specifically, "[i]t is important that the party asserting the defense is not, *simultaneously or in parallel litigation*, seeking affirmative recovery on an identical claim." *Id.* (emphasis added). That is, "whether affirmative defenses are exempt from statutes of limitations largely hinges on a realistic assessment of the parties' litigation posture." *Id.*; *see also Agnew v. United Leasing Corp.*, 680 F. App'x 149, 151 (4th Cir. 2017) (quoting *Evans*, 344 F.3d at 1035).

Applying that principle to the case before it, the Ninth Circuit found that the City was clearly the "aggressor," as the lawsuit boiled down to its attempt to invalidate an agreement. And the City's defenses to the defendants' counterclaims were "mirror images of its time-barred claims." *Id.* at 1035. As such, however denominated, the defenses were "simply time-barred claims masquerading as defenses" and, thus, "likewise subject to the statute of limitations bar." *Id.* at 1035–36; *see also Agnew*, 680 F. App'x at 154 (holding that the plaintiffs could not characterize "time-barred claims as affirmative defenses in order to invalidate" a contract); *Heartland Materials*, 2018 WL 2324075, at *6–7 (holding that the defendants were the true "aggressors" in

the case and that their affirmative defenses, which had been raised in prior litigation as affirmative claims and dismissed as time-barred, were likewise barred when raised as defenses, relying on *Evans*);[13] *Davis v. 24 Hour Fitness Worldwide, Inc.*, 75 F. Supp. 3d 635, 639 (D. Del. 2014) (finding that the defendant was the "initial aggressor . . . despite being the defendant in litigation" and that its affirmative defenses, which "mirror[ed] the time-barred counterclaims," were likewise time-barred (citing *Evans*, 344 F.3d at 1035–36)).

The underlying facts in this case indicate that the defendants served notice upon Don Everly on August 1, 2016 that they were "terminating" the 1980 Release (*see* Doc. No. 41-1, at 16), and the defendants also sought to terminate the 1960 Grant as successors to an author. On November 6, 2017, counsel for the defendants sent counsel for the plaintiff a letter stating that the defendants had been informed by Sony that Don Everly had "reclaimed all copyright termination rights in connection with ['Cathy's Clown']" and giving notice of their contention that "Don Everly has misappropriated the [defendants'] portion of those rights and monies since the effective date of the termination of transfers" by the defendants. (Doc. No. 41-1, at 26.) The letter demanded that the plaintiff "confirm to [the defendants their] share of the ownership in the copyrights and to pay to [them] the associated monetary compensation to which [they are] entitled" and threatened to "pursue all legal remedies available to enforce [their] rights" if he did not. (*Id.*)

In other words, it is the defendants who initially sought to topple the status quo under which Don Everly had been operating since 1980. The defendants are the "aggressors" in this dispute. In

---

[13] In *Heartland Materials*, the district court found, in the alternative, that the claims were barred by issue preclusion. The Sixth Circuit affirmed on issue preclusion grounds, noting that it had not yet addressed the specific issue raised in *Evans* and that, although the district court's analysis was "well reasoned and persuasive," it did not reach the question there because the case "fit[] squarely within the doctrine of issue preclusion." *Heartland Materials, Inc.*, 819 F. App'x at 330.

response to their threat of litigation, Don Everly filed this declaratory judgment action in an essentially defensive posture, seeking a declaration that Phil is not an author of "Cathy's Clown" and, therefore, that the 2014 and 2016 Notices of Termination are invalid and that the defendants are "estopped" from making any claims in connection with the Composition. (Doc. No. 1 ¶¶ 40, 47.) Don is not claiming copyright infringement or seeking damages from the defendants. The defendants, instead, make an authorship claim on behalf of Phil, which the court has found to be time-barred. And, in response to the plaintiff's preemptive claims, they assert a defense based on Phil's authorship. Applying *Evans* to the facts here, the court finds that the defendants, although nominally defendants, seek affirmative relief, and their grounds for relief effectively mirror their defense to Don's claims.

Under these circumstances, because the defendants' authorship claim is time-barred, their defense based on Phil's authorship, which mirrors their affirmative claim, is also time-barred. To conclude otherwise—that is, to apply the general rule and find that the statute of limitations does not operate to bar the defendants' affirmative defense in this case—would lead to the type of "jurisdictional jujitsu" anticipated by *Evans* and could lead to an absurd and circular result. That is, the court has found that the defendants' Counterclaim is time-barred as a result of Don's express repudiation of Phil's claim of authorship in 1980—substantially more than three years before the defendants filed the Counterclaim. However, if the court applied the *Western Pacific Railroad* rule to hold that the defendants' factual defense (that Phil is an author) to Don's claim (his request for an affirmative declaration that Phil is *not* an author) is *not* time-barred, and if the court also concluded as a factual matter that Phil *is* an author, the court would then be required to deny the plaintiff's request for a declaration to the contrary, leaving the parties, and the resolution of this case, completely in limbo, since the court has also denied relief to the defendants on their

Counterclaim. "Put simply, to allow an affirmative defense to be put forth despite a statute of limitations having run is one thing; to expand the period within which a claimant may prove its [authorship] rights outright is an entirely different matter. Since in this case [the defendants] seek[] the latter, the statute of limitations applies and provides yet another reason that [the defendants] cannot make out [their] affirmative defense of joint-[authorship] [of] the Work." *Complex Sys. v. ABN AMBRO Bank N.V.*, 979 F. Supp. 2d 456, 474 (S.D.N.Y. 2013); *see also Everly II*, 2020 WL 5642359, at *8–11.

Having concluded that the defendants' Counterclaim based on Phil's co-authorship of "Cathy's Clown" is time-barred, the court also concludes that their affirmative defense based on Phil's co-authorship is time-barred. As a result, the defendants are unable, as a matter of law, to establish that Phil is a co-author of the Composition. The court, therefore, will grant judgment in favor of Don Everly on Count 1 of the Complaint, in the form of declarations that: (1) because Don Everly expressly repudiated Phil Everly's authorship of "Cathy's Clown" prior to June 1980, and more than three years before the defendants filed their Counterclaim, the Counterclaim is time-barred, and the defendants are legally estopped from claiming that Phil Everly was a co-author of "Cathy's Clown"; (2) because the defendants cannot, as a matter of law, establish that they are the statutory successors of an author, they are estopped from exercising the rights granted to authors of copyrighted works, including the right to terminate a grant of copyright. Likewise, as a result, Don is entitled to judgment in his favor on Count 3 and declarations to the effect that he is the 100% owner of the U.S. rights of termination and the Composition's songwriter royalties and that the defendants have no right to register any rights in the Composition with BMI, the United States Copyright Office, the Harry Fox Agency or any other party or to redirect any monies derived from the Composition.

**V.     CONCLUSION**

For the reasons set forth herein, judgment will enter in favor of plaintiff/counter-defendant

Don Everly on both the Complaint and the Counterclaim.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge